UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DYLAN SINN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Cause No. 1:15-cv-1394-WTL-DML |
| BRUCE LEMMON, et al., | ) ) ) |
| Defendants. | ) |

### ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by the three Defendants who remain in this lawsuit: Bruce Lemmon, Stanley Knight, and John Brush. The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

### I.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

Of particular relevance to this Entry is the axiom that a district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Further, a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993). In short, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Sinn's summary judgment materials were woefully deficient both in responding adequately to the Defendants' statement of facts and in setting forth additional facts with appropriate citations to the record.[1]

## II. BACKGROUND

### A. Properly Supported Background Facts of Record

The properly supported background facts of record, viewed in the light most favorable to the Plaintiff, Dylan Sinn, are as follows. Additional properly supported relevant facts are included in the Discussion section.

---

[1] For example, Sinn cites to Exhibits K and L. *See* Dkt. No. 88 at 2. However, the Court is unable to find those exhibits. If Sinn is perhaps attempting to refer to Exhibits 11 and 12, *see* Dkt. No. 79 at 2, those citations would nonetheless be insufficient, as they would refer to entire depositions rather than the relevant portions thereof. Indeed, Sinn does repeatedly cite to entire depositions, *see, e.g.*, Dkt. No. 88 at 7, in contravention of Local Rule 56-1(e) ("A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. The evidence must be in the record or in an appendix to the brief. The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence.").

Three Defendants remain in the case: Bruce Lemmon, former Commissioner of the Indiana Department of Correction ("IDOC"); Stanley Knight, former Superintendent at Putnamville Correctional Facility ("Putnamville"); and John Brush, a unit manager at Putnamville Correctional Facility.

From June 2011 to February 2015, Dylan Sinn was incarcerated within the IDOC. In 2014, the IDOC moved Sinn to Putnamville because his security level was decreased due to good behavior. At Putnamville, Sinn was with other offenders who were deemed to be a lower security risk than those inmates at his prior facility, and he was put in an open dorm.[2] Sinn felt that he was affected by gang activity at Putnamville from the time he arrived there; however, before the events in April 2014 out of which this case arises, he did not report any threats to prison officers, although he had received information from the IDOC that encouraged inmates to report illegal activity at the facilities.[3] Sinn told counselors that he did not like the open dorm set-up and wanted to move back to a facility with single-man cells. However, he did not ask for protective custody.

---

[2] Sinn indicates that he disagrees with this statement, but the evidence he cites does not create a genuine issue of material fact. Rather, the deposition testimony Sinn cites expresses only that Sinn was aware of Security Threat Group ("STG") activity and was anxious about it. *See* Dkt. No. 88 at 4 (citing Sinn Dep. at 41-42).

[3] Sinn indicates that he disagrees with this statement, but, again, the information he cites in response does not create a genuine issue of material fact. Rather, it actually corroborates the Defendants' assertion:
    Q. Did you tell anyone about this (threat)?
    A. No.
    Q. Why not.
    A. At the Farm (Putnamville) that's an everyday occurrence. That happening. If I would have told somebody, nothing would have happened. Nothing. . . . And it would make it 20 times worse for me [and make] the Vice Lords in the dorm mad.
Dkt. No. 88 at 5 (citing Sinn Dep. at 43-49).

In April 2014, Sinn lived in Putnamville Dorm 11 South. Prior to April 24, 2014, he had not been harmed. However, on April 24, 2014, an inmate lured Sinn from his bed to an area that was not far away. Sinn was grabbed from behind, his arms were restrained, and another inmate punched Sinn's face several times. Sinn believes that two or three inmates were involved in the attack, and those inmates were Vice Lords or "real good friends of them." Dkt. No. 79-11 at 55. In the days after the attack, it became clear to Sinn that the attack had been choreographed by the gang. Sinn was not injured badly by the attack; he had some scrapes and maybe a busted lip, but nothing he felt was serious. Sinn believed that he was targeted for the attack because he was unaffiliated with any gang and was a "White, clean-cut, tall, nerdy guy with glasses." *Id.* 11 South was regularly understaffed and had just one correctional officer on the floor when Sinn was attacked.

After the attack on April 24, Officers Paul Hoskins and Scott Rodgers reviewed the video and moved Sinn to a different dormitory: 18 South. 18 South was regularly understaffed and had just one correctional officer on the floor when Sinn was again attacked. Sinn told Hoskins and Rodgers that the situation was not going to stop and in fact would escalate.[4] He wanted to know why he was being moved while his assailants remained in the same dormitory. Hoskins and Rodgers told Sinn that he needed to speak with his counselor the next day. At the time, Sinn did not know about protective custody.

When Sinn was taken to 18 South after the attack, he was met by other members of the same gang who let him "know that it wasn't over yet; that they were going to get me when time came and they saw fit. . . . They said they had Vice Lords all over the camp. There wasn't any

---

[4]The Court granted the Defendants' motion for judgment on the pleadings as to Sinn's claims against Rogers and Hoskins because Rogers and Hoskins raised the defense of qualified immunity and Sinn failed to address the issue in his response. *See* Dkt. No. 48 at 12.

4

dorm I'd be safe in." *Id.* at 57. He did not tell anyone about these threats. When he went to breakfast the next morning, he saw Defendant Brush. Brush already knew about the incident and told Sinn that he had handled himself well. Sinn told Brush about his concerns and asked to be moved to a different facility. Sinn did not tell Brush any of the names of the people who concerned him; he did not know any of their names at the time.

Sinn wrote a letter to Brush that is dated April 26, 2014. The letter recounted the events of April 24, 2014, and indicated that Sinn believed he would be subject to assault from black inmates. Sinn does not recall whether he turned in the letter to a counselor's box in the chow hall or slipped it under the counselor's door. Sinn did not have any communication with Brush after he sent the letter.

Sinn also filled out a grievance form on April 28, 2014, which reads in relevant part:

> On 4-24-14 @ approx. 5:30 pm in 11 South, I was assulted, jumped, and robbed for all my property. Hygeine, good, cloths, glasses, shoes, and radio and headphones. Camera showed the incident and who was involved. Due to number of black gang members involved and time of incident. Custody violated by 8th Amendment protection rights by deliberate indifference. Further putting me in violent situations over the incident and other people involved being retaliated against.

Dkt. No. 79-9 (errors in original).

Between April 24 and April 30, Sinn was threatened by members of the Vice Lord gang. They threatened him because he defended himself against his property being taken and because they believed he was taking steps to talk with officers about his safety. They knew that he got pulled out, spoke to officers, and was moved. They were making it clear what their intentions were.

On April 30, 2014, Sinn was again assaulted by black inmates. He believes that the people who attacked him were members of the Vice Lords. They forced him into the shower area

and severely beat him. Sinn's leg was broken in two places, and he also suffered a fractured jaw, a broken nose, and several contusions to his face and body. Sinn was taken by ambulance to a hospital and then transferred to a different hospital, where he underwent two surgeries. It was later determined that Sinn had been assaulted by inmate Marquette Neal. Inmate Chauncey Davenport also was involved. Both Davenport and Neal were put in disciplinary segregation.

**B.    Additional Facts Set Forth by Sinn That Are Not Properly Supported**

Sinn provides a Statement of Material Facts in Dispute or Favorable to the Plaintiff in his Brief.[5] The Court has incorporated the facts that Sinn properly supports into section A, above. The Court will address Sinn's remaining purported facts, in turn.

Sinn asserts that the "following facts are in dispute or are favorable to the Plaintiff's theory of liability against each defendant: Bruce Lemmon, Stanley Knight, John D. Brush, Scott Rodgers, and Paul Hoskins." Dkt. No. 88 at 8. First, "Dylan Sinn did all that he was required to do to alert the Security staff at Putnamville of the imminent threat he feared in retaliation for

---

[5]Sinn also provides a "Plaintiff's List of Additional Exhibits and Evidence in Support of His Argument Objecting to Defendants' Motion for Summary Judgment." Dkt. No. 88 at 9-10. The Court is unable to locate in the record several of the items, including the deposition of Paul Hoskins; the deposition of Scott Rodgers; and pictures of dormitory 11 South and 18 South. In any case, simply providing a list is insufficient, as the Court is "not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Sinn also lists the Affidavit of Kandi Northcutt (Dkt. No. 88-5) and the Affidavit of Matthew Dunham (Dkt. No. 88-6). Each of these affidavits fails to comply with Federal Rule of Civil Procedure 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). As the Defendants point out, neither Northcutt nor Dunham was employed at Putnamville during the time period that gave rise to Sinn's lawsuit. Rather, Northcutt was employed by the IDOC between April and July 2016, and Dunham was employed by the IDOC and assigned to Putnamville from January 2009 to May 2012. As such, neither has personal knowledge of the conditions at Putnamville in 2014, and the facts cited in their affidavits would not be admissible as evidence.

6

reporting the gang attack on April 24, 2014, by the Vice Lords. Brush Dep. p.83, Knight Dep. p 193." *Id.* Neither of the pages cited by Sinn supports this fact.

Second, "[t]he security staff could verify the attack on April 24 on another white inmate by the Vice Lords on April 25 or 26. There were 6 security cameras on each side of the dorm." Dkt. No. 88 at 9. Sinn fails to support this allegation with a citation to material in the record.

Third, "Michael Berg, an expert in prison and jail management and operations, found the events of April 24, and April 30 at Putnamville to have been preventable. Mr. Sinn did meet the obligation to inform the security staff in sufficient detail of his well-founded fear of being attacked by the Vice Lords or their friends. Paul Hoskins did not know what to do if an inmate was in fear of being attacked. Hoskins Dep. p. 88." Dkt. No. 88 at 9. The Court is unable to locate Hoskins' deposition in the record before the Court.

Fourth, "[t]he Defendants did not provide an expert report nor would they identify what Mr. Lemmon and Mr. Knight would offer an opinion about. They are now precluded from offering any expert opinion." Dkt. No. 88 at 9. This statement is not a material fact relevant to Sinn's claims.

### III. DISCUSSION

Sinn's remaining claims are based on his assertion that the Defendants violated his rights under the Eighth, Fourth, and Fourteenth Amendments by imposing cruel and unusual punishment. Following the Court's entry on the motion for judgment on the pleadings, the following claims remain: (1) claims related to failure to protect against Defendant Brush; and (2) claims related to failure to protect against Defendants Lemmon and Knight in their individual capacities.

7

## A. Claims Against Defendant Brush

A prison official can violate the Eighth Amendment by failing to take reasonable steps to protect inmates from a known, substantial threat to their safety. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The official must have actual knowledge of "a substantial risk of serious harm." *Id.* It is not enough that he failed to address "a significant risk that he should have perceived but did not." *Id.* at 838. The Supreme Court expressly rejected the suggestion that a prison official violates the Eighth Amendment when he might have known—or even should have known—of a risk of harm. *See id.* at 837-38. Further, mere negligence is insufficient to state a claim for deliberate indifference. *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Even gross negligence does not constitute deliberate indifference. *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir. 1998) (citation omitted).

Prison officials have a duty to ensure the safety of inmates from the violent acts of other inmates. *Id.* A beaten inmate must establish that the prison official knew that the inmate faced a substantial risk of serious harm and, appreciating the danger, failed to take reasonable measures to abate it. *Id.* (quotation and citation omitted). A prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (citation omitted). "Prisons, after all, are dangerous places often full of people who have demonstrated aggression." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008).

A complaint that conveys only a generalized or vague concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). In *Gevas*, the

8

court collected examples of complaints that did not support an inference that the official had actual knowledge:

> *See, e.g., Dale v. Poston,* 548 F.3d 563, 569 (7th Cir. 2008) ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); *Klebanowski v. Sheahan,* 540 F.3d 633, 639-40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what the threats were); *Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir. 2008) (prisoner did not mention to guards that he was perceived to be a "snitch" or otherwise apprise them of a specific threat to his life); *Butera v. Cottey,* 285 F.3d 601, 606 (7th Cir. 2002) (prisoner only stated vaguely that he was "having problems" in his cellblock and "needed to be removed").

*Id.*

Sinn points to his letter addressed to Brush and the conversation he had with Brush as evidence that supports his claim that Brush failed to protect him. In his deposition, Sinn stated that Brush initiated a conversation with Sinn and recounted their conversation as follows:

> I told him my concerns, told him what was going on. I said I know I'm going to get it again here soon. I'm going to be back in trouble, you know. [I was concerned about] getting beat up or having to get in an altercation, either way. Whether you get beat up, or you do the beating up, it's still the same in your head. You're still going to get in trouble. And if you do the beating up, you're worse off because, again, you've got more people mad at you. You're almost just better to get beat up.

Dkt. No. 79-11 at 68. Sinn told Brush, "[Y]ou'll be getting a call. It's coming. I mean, it's just a matter of time before they feel like they're going to move in on me when they see the time is right." *Id.* Sinn told Brush that Sinn wanted to be moved; he either wanted to go back to a Level 3 or Level 4 facility, or be moved out of Putnamville. Brush told Sinn to write Brush a report. During the conversation, Sinn did not tell Brush any of the names of the people who concerned him; he did not know any of their names at the time.

Sinn then wrote a letter to Brush. In the letter, Sinn never mentioned gangs; rather, he discussed race and the racial conflicts at Putnamville:

9

> On 4-24-14 at approximately 5:30 pm in II South I was jumped and robbed for all my property. Hygeine, food, clothes, [illegible] shoes, radio and headphones.
>
> I was pulled out by officers and taken to medical to be inspected. Following the incident I was moved to another dorm.
>
> Officers stated to me that they saw who was involved and who robbed my property. They said the camera clearly showed it, yet no actions were taken due to inconvenience of time and housing overcrowdness.
>
> In the days that followed this incident the other two white people moved with me were assaulted again and jumped.[6] Further showing that the incident followed them to the new dorms. I have yet to be assaulted again. But I know it's coming.
>
> The administration turns a blind head to the racial differential of conflicts here at PCF. This incident is prime example. Several offenders (more than 6) could be Id on video robbing and assaulting offenders, but because seg is full and custody doesn't want to deal with the drawn out procedures for properly addressing the situation at 5:30 p.m. (waiting to clock out at 6 pm.) My safety is jeapordiced due to this.
>
> These black inmates had the wide open ability to have the other two people besides myself jumped less than 24 hours after the incident, and custody again took no action.
>
> When I am moved from 18 south to BMU or another Idle unit I will be subjected to these assults. Assults I know through experience that won't be caught or addressed with proper attention.
>
> I will not let myself be put in that vulnerable situation. I'm not affallated. I am by myself and I'm a white minority. I'd rather refuse housing than to get my brains stomped in the floor by ten hated filled racist blacks. Even scarier the alternative of defending myself and seriously hurting someone.

Dkt. No. 79-8 (errors in original). Neither Sinn's recollection of the conversation nor this letter provides the specific information that would provide Brush actual knowledge of "a substantial risk of serious harm." Rather, while Sinn expressed concerns about his safety and requested to be moved, he did not identify individuals or even mention a particular

---

[6]Sinn is referring to Justin Franklin and another inmate whose name he did not know.

gang in either the letter or conversation. Simply identifying a particular race of inmates is too generalized a concern to support an inference that a prison official had actual knowledge that the prisoner was in danger. Because Sinn has failed to point to facts of record that could allow a reasonable finder of fact to find that Defendant Brush acted with deliberate indifference, Defendant Brush is entitled to summary judgment on the claims against him.

### B. Claims Against Knight and Lemmon

Sinn does not point to evidence of record from which a reasonable trier of fact could find that either Knight or Lemmon had personal knowledge of Sinn's situation. Rather, he alleges that Knight and Lemmon were responsible for the failure of gang policies and deliberate understaffing and budget for staff, which created a security problem.

To hold defendants liable under § 1983, a plaintiff must demonstrate that the defendants' "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). An unconstitutional policy can include both implicit policies as well as a gap in expressed policies. *Id.* (citation omitted).

When seeking to rely upon indirect proof, a plaintiff must point to admissible evidence that could allow a reasonable trier of fact to find "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Dixon*, 819 F.3d at 348 (quotation mark omitted). If he is able to do so, he must then show that a policymaker or official knew about these deficiencies and failed to correct them. *Id.* (citation omitted). To be attributed to the municipality as a "policy," a course of action must be

"consciously chosen from among various alternatives;" therefore, evidence must "be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a . . . program which would prove inadequate." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

Lemmon and Knight are responsible for policy and staffing at Putnamville. They are also responsible for implementing and sustaining policies which are effective and provide a reasonable response to a notice from an inmate that he fears for his safety or his life. In his response, Sinn indicates that he "alleges that Commissioner Lemmon and Superintendent Knight made a deliberate decision to deny inmates who were being threatened by gangs, objectively reasonable protection under the Eighth Amendment by deliberately understaffing the facilities and not providing appropriate safety measures to protect Mr. Sinn." Dkt. No. 88 at 16.

In support of his argument, Sinn cites to the following language from the report by his expert, Michael Berg:

> It is my professional opinion that as a result of numerous deliberate procedural failures and the utilization of bad customs and practices by the personnel of the Indiana Department of Correction, and those of the Putnamville Correctional Facility, Mr. Dylan Sinn was wrongfully injured as a result of a total [sic] predictable gang assault on April 30th, 2014. As identified earlier, these failures included but may not be limited to: failure to respond, failure to report, failure to provide safe and administrative housing, failing to provide coordinated efforts between security, classification and the security threat group unit, failure to protect, failure to adequately train, failure to properly handle administrative requests and grievances, failure to staff security units appropriately, failing to monitor the in-cell activity of housing units, failing to safely monitor the daily behavior of gang members and other high risk offenders, and failing to supervise the performance of their line staff officers and specialized units.
>
> As a result of these failures, the Indiana Department of Correction also failed to provide the care, custody, and control of their inmate population in a constitutional and statutory manner. More specifically, inmate Dylan Sinn was unnecessarily attacked and seriously injured by well known gang members – that

had an equally well-known history of disruptive behavior – on April 30th, 2014, while being detained within the Putnamville Correctional Facility. It was a needless and preventable event to say the very least.

Dkt. No. 88 at 19.

The statement, "As a result of these failures, the Indiana Department of Correction also failed to provide the care, custody, and control of their inmate population in a constitutional and statutory manner," is a legal conclusion, and, as such, is not evidence that can be used to avoid summary judgment. *See, e.g.*, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997). Likewise, the use of the word "deliberate" to describe the purported procedural failures would not be permissible, as it would communicate a legal standard, either explicitly or implicitly. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (holding that the expert should not have been permitted to testify that the defendant acted with deliberate indifference and should not have been permitted to define deliberate indifference).

With respect to gang violence, the IDOC adopted policies and procedures to address problems related to gangs, referred to within the Department as Security Threat Groups ("STGs")."[7] Putnamville, in accordance with Department policy, had an STG coordinator who tracked inmates who were confirmed STG gang members.[8] IDOC employees get training about

---

[7]Sinn indicates that he disagrees with this fact, but the information he cites in response does not create a genuine issue of material fact. Rather, Sinn asserts, "Putnamville had a requirement of 2 STG coordinators, but they did not track any gang activity or gang members." Dkt. No. 88 at 7. In support of this statement, Sinn cites the Affidavits of Sinn, Durham, and Northcutt. However, none of these affidavits actually supports this fact, and, as noted above, the Affidavits of Durham and Northcutt do not contain evidence that would be admissible.

[8]Sinn indicates that he disagrees with this fact, but Sinn has not demonstrated that, as an inmate, he has personal knowledge as to what the STG coordinator does. *See* Federal Rule of Civil Procedure 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Further, Sinn's

13

STGs.[9] IDOC employees are taught the importance of tracking known gang affiliations to manage the facilities, to determine whether a certain offender may be appropriate for a specific facility.[10]

With respect to deliberate understaffing, Putnamville has had turnover among its correctional officers and counselors. Defendant Knight, former Superintendent at Putnamville, believes that the job is tough and not for everyone, and it does not pay particularly well.[11] While Knight has heard the complaint that former correctional officers felt that Putnamville was being deliberately understaffed, Knight believes those in charge of hiring are pretty aggressive and work hard to keep their ranks full. During April 2014, Putnamville had twenty-seven vacancies.[12] Knight would have filled the vacancies if he had been able to do so. He did not

---

assertion that "the gang members would openly wear their gang tattoos and everyone on the dorm knew who were the gang members, but the security staff did nothing," Dkt. No. 88 at 7, does not establish a presence of a genuine dispute because it is not inconsistent with the Defendants' facts.

[9] Sinn indicates that he disagrees with this fact: "Training was superficial and ineffective. See Affidavits of Sinn, Durham, and Northcutt." Dkt. No. 88 at 8. As noted above, the Affidavits of Durham and Northcutt do not contain evidence that would be admissible. Further, Sinn has not demonstrated that, as an inmate, he has personal knowledge about the training.

[10] Again, Sinn disagrees with this fact: "The STG policy is detailed but is not followed by hardly any staff. Mr. Knight did not see any C.O. at any security station on the video surveillance CD on either occasion, nor did he see anyone show up for 3 minutes. It is reasonable to assume that no one was on the floor or they were fearful of stepping in to the situation without backup. If the C.O. was on station he would have seen a congregation of black offenders. That means something to everyone whether you are an inmate or a security officer." Dkt. No. 88 at 8 (errors in original). Sinn's response fails to support his factual position because he does not cite to particular parts of materials in the record. *See* Fed. R. Civ. Pro. 56(c).

[11] Sinn indicates that he disagrees with this statement, but he again fails to comply with Local Rule 56-1(e), which requires that he include a citation that refers to a page or paragraph number or otherwise similarly specify where the relevant information can be found. Rather, he simply refers to "the video and the affidavits provided by 2 former C.O.s, one former inmate, and Mr. Sinn." Dkt. No. 88 at 7. Further, Sinn's statement that the video and affidavits "demonstrate that often no one is on the dorm floor" (Dkt. No. 88 at 7) does not establish the presence of a genuine dispute because it is not inconsistent with the Defendants' facts.

[12] Sinn indicates that he disagrees with this fact: "Mr. Knight claimed to have determined the vacancy number on the day of the attack, but he did not have any documentation to refute the

intend to have vacancies. Contrary to Sinn's unsupported allegations, Knight was never in a discussion regarding governmental departments being required to return ten percent of their budget. In fact, Knight spent his budget and sometimes went a little over budget.[13]

Putnamville is accredited by the Commission on Accreditation for Corrections. A reaccreditional audit was conducted on August 20-23, 2013, and the Commission found the facility to be in 100% compliance with the mandatory standards.

Even assuming for the purposes of this Entry that Berg's report is sufficient to support a finding that there were systemic and gross deficiencies in staffing, facilities, equipment, or procedures, Sinn points to no evidence of record that could allow a reasonable factfinder to find that Knight or Lemmon instituted policies that would prove inadequate. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). Sinn has not pointed to evidence of a deliberate decision to either deny protection or to understaff the facilities. Mere allegations are insufficient at the summary judgment stage. In any case, Sinn has failed to point to evidence to show that

---

videos on two occasions or the affidavits offered to support Mr. Sinn. Knight admits that 'on occasion' there may have been one C.O. in a dorm of 150 inmates for an 8-hour shift. Knight Dep. pp. 151-154. Even if the number is 23 or 27, those vacancies are normally the entry level C.O. positions. On average the facility was always short staffed." Dkt. No. 88 at 7. Again, Sinn fails to properly address the Defendants' assertion of fact as required by Federal Rule of Civil Procedure 56(c).

[13]Sinn indicates that he disagrees with this fact: "Mr. Knight did not provide any documentation on budget appropriations or expenses. With 27 vacancies and associated employee costs, he was not spending. He was always under budget. He would be saving almost $1,000,000 each year. Where did it go if it was not spent?" Dkt. No. 88 at 7-8. Sinn's response fails to support his allegation by citing to particular parts of materials in the record. Further, Sinn has not asserted that Knight did not have personal knowledge about Putnamville's budget.

Lemmon or Knight had the culpable state of mind that their decisions would result in substantial harm to inmates.

Nor does Sinn point to facts of record that could allow a reasonable trier of fact to find that the gang violence was so prevalent at Putnamville that it created a virtual "reign of terror." *See Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997). The Seventh Circuit has recognized that pervasive violence in a prison may create unconstitutional conditions of confinement. *See James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992); *Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir. 1984). However, Sinn fails to point to facts of record, such as the number or frequency of incidents of inmate-on-inmate violence, to establish that violence at Putnamville was so pervasive as to violate the Eighth Amendment. *See Lewis*, 107 F.3d at 555 (rejecting the plaintiff's claim). Because Sinn has failed to point to facts of record that would allow a reasonable finder of fact to find that Defendant Knight or Defendant Lemmon acted with deliberate indifference, Defendants Knight and Lemmon are entitled to summary judgment on the claims against them.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment.

**SO ORDERED: 3/6/18**

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.