# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

January 7, 2019

To:     Laura A. Briggs
        UNITED STATES DISTRICT COURT
        Southern District of Indiana
        United States Courthouse
        Indianapolis , IN 46204-0000

|  | |
|---|---|
| No. 18-1724 | DYLAN SINN,<br>Plaintiff - Appellant<br><br>v.<br><br>BRUCE LEMMON, Commissioner, et al.,<br>Defendants - Appellees |

| **Originating Case Information:** |
|---|
| District Court No: 1:15-cv-01394-WTL-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:              Entire record returned consisting of

Exhibits:                             - Supplemental paper record on

appeal filed. 1 vol. exhibits. -----
oversized record 1 box containing
exhibits

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                             **Received by:**

_____1/7/2019_____

_____
Deputy Clerk, U.S.District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## FINAL JUDGMENT

December 14, 2018

Before:

JOEL M. FLAUM, Circuit Judge
ILANA DIAMOND ROVNER, Circuit Judge
MICHAEL Y. SCUDDER, Circuit Judge

| | |
|---|---|
| No. 18-1724 | DYLAN SINN,<br>Plaintiff - Appellant<br><br>v.<br><br>BRUCE LEMMON, Commissioner, et al.,<br>Defendants - Appellees |

| Originating Case Information: |
|---|
| District Court No: 1:15-cv-01394-WTL-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

For the foregoing reasons, we **AFFIRM** the grant of judgment on the pleadings as to Rodgers and Hoskins, **AFFIRM** the grant of summary judgment as to Knight and Lemmon, but **REVERSE** and **REMAND** the grant of summary judgment as to Brush.

The above is in accordance with the decision of this court entered on this date. Both sides can bear their own costs.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 18-1724

DYLAN SINN,

*Plaintiff-Appellant,*

*v.*

BRUCE LEMMON, Commissioner, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-01394 — **William T. Lawrence**, *Judge.*

———————————

ARGUED DECEMBER 5, 2018 — DECIDED DECEMBER 14, 2018

———————————

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant Dylan Sinn was incarcerated within the Indiana Department of Corrections ("IDOC") from June 2011 to February 2015. In 2014, while an inmate at Putnamville Correctional Facility ("Putnamville"), he suffered injuries from two separate assaults by other inmates. Sinn filed this lawsuit pursuant to 42 U.S.C. § 1983 against defendants-appellees, various prison officials, alleg-

ing deliberate indifference in violation of the Eighth Amendment. Sinn appeals the district court's decision to grant judgment on the pleadings as to Putnamville Sergeant Scott Rodgers[1] and Putnamville Correctional Officer Paul Hoskins, as well as the district court's decision to grant summary judgment as to John Brush, former Putnamville Unit Manager, Stanley Knight, former Putnamville Superintendent, and Bruce Lemmon, former IDOC Commissioner. We affirm the judgments of the district court in all respects except one: we reverse and remand the district court's grant of summary judgment as to Brush.

## I. Background

### A.  Factual Background[2]

Sinn suffered two attacks by fellow inmates during his incarceration at Putnamville. The IDOC had transferred Sinn to the facility in 2014 after his good behavior made him eligible for a lower security level. His initial placement was an open dorm in 17 South. After moving through several other dorms, Sinn moved to 11 South in April 2014.

While imprisoned at these various dorms, Sinn witnessed daily fights between other inmates, and he noticed that guards were rarely present when fights began. The record shows that Putnamville struggled to deal with overcrowding

---

[1] The district court and the parties have inconsistently spelled this defendant's last name as either "Rogers" or "Rodgers." According to one of defendants' filings below, "Rodgers" is the correct spelling, and we therefore use this version.

[2] These facts are undisputed unless otherwise noted.

of inmates and understaffing of guards. The facility was de-
signed for 1,650 inmates, but it had a recorded average daily
population of 2,490 state prisoners in 2013. Putnamville was
also unable to fill correctional officer vacancies in a timely
manner; in April 2014, there were 27 vacancies at the facility
out of 350 positions. Additionally, at his deposition, Sinn said
he rarely saw more than one guard at any of the dorms, except
maybe once or twice a week.

Sinn felt affected by gang activity as soon as he arrived at
Putnamville, but he did not report any threats until his April
2014 assaults. Sinn acknowledges that he received infor-
mation from the IDOC encouraging inmates to report illegal
activity, including "security threat groups" (*i.e.* gangs).

The first attack on Sinn occurred on April 24, 2014, and it
was partially captured on video. Several inmates stole Sinn's
property box and hauled it into the bathroom to divvy up the
contents. When Sinn realized what happened, he ran into the
bathroom to retrieve the box, at which point several inmates
attacked him by grabbing him from behind, restraining his
arms, and punching him in the face several times.[3] Sinn only

---

[3] Although defendants note that "[t]he alleged attack does not appear on
the surveillance video," this footage does support some of Sinn's narra-
tive. The footage shows two inmates holding a property box walk into the
bathroom off-screen. Shortly after those two inmates set the box down in-
side the bathroom (mostly out of view), several others walk in. Sinn then
runs into the bathroom; while he is in there, an inmate in the hallway out-
side the bathroom gets punched in the face by another inmate. Sinn comes
out of the bathroom, and the inmate who just threw a punch comes back
into view and punches a second inmate. Sinn pulls that inmate away from
the punching inmate. A correctional officer arrives, and the area mostly
clears. The second inmate gets handcuffed and taken off-screen. This en-

sustained minor injuries: he "split [his] hand," "had some scrapes," and "[m]aybe [had] a busted lip or something." No guards were present at the time of the attack. After the attack, though, Correctional Officer Paul Hoskins and Sergeant Scott Rodgers arrived. They handcuffed Sinn and the two other inmates who had been attacked, took them to a back office for questioning, and reviewed the surveillance footage.

At his deposition, Sinn said he was "pretty sure" the inmates who attacked him were members of the "Vice Lords" gang, "or real good friends of them," in part because Hoskins told Sinn the attackers were Vice Lords. Sinn believed he was targeted because he was an "unaffiliated[] [w]hite, clean-cut, tall, nerdy guy with glasses." He believed an inmate "become[s] a pretty easy target when [he's] unaffiliated."

After reviewing the surveillance footage, Rodgers and Hoskins decided to move Sinn and the other two inmates to new dormitories; they transferred Sinn to 18 South. Sinn complained to Rodgers and Hoskins that they were not moving the attackers, and he told them that he was still concerned for his safety because "this isn't going to stop. This is going to escalate." In response, Sinn says Rodgers and Hoskins told him to talk to his counselor.

Within a few hours of arriving at 18 South, Sinn said he "was met by other gang members of the same gang letting me know that it wasn't over yet; that they were going to get me

---

tire sequence of events lasts less than five minutes. Though the surveillance footage does not show any inmates attacking Sinn, it is reasonable to infer that for the seconds he is in the bathroom, but just off-screen, some inmates attacked him.

when [the] time came and when they saw fit." He did not report those threats. Instead, when he went to breakfast the next morning, April 25, he talked to Unit Manager John Brush about what had happened. Sinn had interacted with Brush before this incident and trusted him, in part because Brush had facilitated a relocation request for Sinn in the past and in part because Sinn felt Brush genuinely cared about his wellbeing.

Brush already knew about the first attack when they met that morning, according to Sinn, and he asked Sinn how he was doing. Sinn told Brush his concerns; specifically, he testified that he told Brush, "I know I'm going to get it again here soon. I'm going to be back in trouble, you know." Sinn did not tell Brush the specific names of any people he was concerned might attack him because he did not know any of their names at that point. He did tell Brush that he wanted to be moved to a different dorm. Brush told Sinn to send him a written request and he would "look over it as soon as he [could]."[4]

Per these directions, Sinn wrote Brush a letter dated April 26, 2014, describing his concerns. In this letter, Sinn does not use the specific words "gangs" or "Vice Lords" but focuses on the racial difference between the attackers (who were all black) and those attacked on April 24 (who were all white):

> On 4-24-14 @ approx 5:30 pm in 11 South I was jumped and robbed for all my property.
>
> …

---

[4] At his own deposition, Brush did not recall this interaction, but he did not deny that it happened.

I was pulled out by officers and taken to medical to be inspected. Following the incident I was moved to another dorm.

Officers stated to me that they saw who was involved and who robbed my property. They said the camera clearly showed it. Yet no actions were taken due to inconvenience of time and housing overcrowdedness.

In the day that followed this incident the other two white people moved with me were assulted [sic] again and jumped. Further showing that the incident followed them to the new dorms. I have yet to be assulted [sic] again. But I know it's coming.

…

These black inmates had the wide open ability to have the other two people besides myself jumped less than 24 hrs after the incident, and custody again took no action.

When I am moved from 18 South to BMU or another idle unit I will be subjected to these assults [sic]. Assults [sic] I know through experience that won't be caught or addressed with proper attention.

I will not let myself be put in that vulnerable situation. I'm not affaliated [sic]. I am by myself and I'm a white minority… .

Sinn either placed this letter in Brush's box or slipped it under the counselor's door. The record does not establish exactly when Brush read Sinn's letter. Brush does not remember receiving or reading the letter, but he conceded at his deposition that the letter "probably came to [him]." Sinn estimated that it typically took "two or three days" for a letter to be processed through the prison mail system.

Sinn also communicated his safety concerns in two other ways. He told Putnamville Sergeant Myers that he was in danger and needed protection from being assaulted again. Sinn says Myers told him to simply "deal with it." Sinn also filled out a grievance, dated April 28, which stated that he had been assaulted and robbed on April 24 in 11 South by a "number of black gang members" and the "other people involved [were] being retaliated against." However, the record does not establish who received this grievance or when they received it.

On April 30, 2014, two inmates attacked Sinn in the bathroom area of 18 South; as with the earlier assault, no officers were present. Sinn believed his attackers were gang members and that they intended to retaliate against him for defending himself in the first attack. As a result of this assault, Sinn sustained a broken nose, jaw, and leg. Investigators identified the assailants as Chauncey Davenport and Marquette Neal; the IDOC had previously identified Davenport as a gang member. The IDOC placed Davenport and Neal in disciplinary segregation and referred the case to the internal disciplinary board as well as the Putnam County Prosecutor. Sinn was ultimately released from IDOC custody in 2015.

### B.  Procedural Background

Sinn originally filed this action against eighteen defendants in Marion County Superior Court on May 27, 2015. Defendants removed the case to federal court on September 3, 2015. As relevant here, Sinn alleged Rodgers, Hoskins, Brush, Knight, and Lemmon all violated the Eighth Amendment by failing to protect him from gang violence at Putnamville. While Sinn alleged Rodgers, Hoskins, and Brush were individually responsible for their personal involvement in these events, he alleged that Lemmon and Knight (as Commissioner of IDOC and Superintendent of Putnamville, respectively) were individually liable because they ignored rampant overcrowding, understaffing, and gang problems at the facility.

Approximately six months after Sinn filed the complaint, all defendants except Brush moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). On January 24, 2017, the district court granted in part and denied in part this motion. The court dismissed all official capacity claims and all individual capacity claims except those against Brush, Knight, and Lemmon. Relevant here, the court granted judgment on the pleadings as to Rodgers and Hoskins because they raised the affirmative defense of qualified immunity, and Sinn argued "absolutely nothing in response." The court thus reasoned that Sinn "presumably concede[d] that [Rodgers and Hoskins were] entitled to qualified immunity." On June 22, 2017, Sinn moved for reconsideration of the dismissal of Rodgers and Hoskins as individual defendants. The district court denied this motion on October 12, 2017, leaving Brush, Knight, and Lemmon as the only remaining defendants in the case.

On July 14, 2017, these defendants moved for summary judgment. The district court granted that motion on March 6, 2018. On appeal, Sinn challenges the district court's decision to grant judgment on the pleadings as to Rodgers and Hoskins, and the district court's decision to grant summary judgment as to Brush, Knight, and Lemmon.

## II. Discussion

### A.  Judgment on the Pleadings

We review the district court's grant of judgment on the pleadings de novo, asking whether the well-pleaded factual allegations viewed in favor of the nonmoving party state a facially plausible claim for relief. *Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense, and once raised, the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). "A failure to show either is fatal for the plaintiff's case." *Id.* (citing *Pearson*, 555 U.S. at 236).

Sinn admits his brief in response to defendants' Rule 12(c) motion did not have a section devoted to the qualified immunity issue. Nevertheless, he argues his brief sufficiently addressed the constitutional deprivations Rodgers and Hoskins

allegedly caused, and therefore, his claims against these defendants should not have been dismissed on the pleadings.

We disagree. In support of their motion for judgment on the pleadings, Rodgers and Hoskins argued they were not deliberately indifferent to Sinn's safety and that they were entitled to qualified immunity. Sinn only responded to the former argument. The district court granted defendants' motion specifically because Sinn made no attempt to respond to the qualified immunity point. Sinn moved for reconsideration of this decision, but again he made no substantive argument about Rodgers's and Hoskins's entitlement to qualified immunity; instead Sinn argued that this determination was inappropriate at the Rule 12(c) stage.

Once defendants raised the qualified immunity defense, even at the pleading stage, it was Sinn's burden to overcome it. *Archer*, 870 F.3d at 613; *cf. Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018) (allowing for defendants to assert a qualified immunity defense at the pleading stage, though noting at this stage the defense is subject to a more challenging review). Despite Sinn's arguments on appeal, simply pointing to his complaint's allegations was insufficient to meet this burden. Even assuming the complaint stated a claim that Rodgers's and Hoskins's conduct in transferring Sinn after the first attack violated the Constitution, Sinn did not address the "clearly established" prong of qualified immunity in the district court. *See Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013) (a plaintiff can show that law is clearly established and defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have

thought he was acting lawfully"). Sinn may not relitigate this issue on appeal because he failed to respond to defendants' arguments on it before the district court. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017).

We therefore affirm the district court's grant of judgment on the pleadings as to Rodgers and Hoskins.

## B. Summary Judgment

Sinn also challenges the district court's conclusions at summary judgment that Brush, Knight, and Lemmon were not deliberately indifferent. We review the district court's grant of summary judgment de novo, interpreting all facts and drawing all reasonable inferences in favor of the nonmoving party. *Daugherty v. Page*, 906 F.3d 606, 609 (7th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Eighth Amendment's prohibition of "cruel and unusual punishments" obligates prison officials to "take reasonable measures to guarantee the safety of … inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To establish an Eighth Amendment violation, an inmate must show that a defendant was deliberately indifferent to "an excessive risk to inmate health or safety[.]" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (alteration in original) (quoting *Farmer*, 511 U.S. at 837). This includes two components: (1) "the harm to which the prisoner was exposed must be an objectively serious one"; and (2) judged subjectively, the prison official "must have actual, and not merely constructive, knowledge of the risk." *Id.*

For this second element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Defendants do not dispute that the injuries Sinn suffered from the attack on April 30, 2014 constituted an objectively serious harm. They instead dispute the second element: whether Brush, Knight, and Lemmon each had the requisite knowledge of a substantial risk of that harm to rise to the level of deliberate indifference.

### 1. *Brush's Deliberate Indifference*

Sinn argues that he complained to Brush about the risk to his safety and that Brush ignored those complaints. It is undisputed that Brush had an in-person conversation with Sinn on April 25 about the first attack and Sinn's resulting concerns. Likewise, it is also undisputed that per Brush's instructions, Sinn wrote Brush a letter the next day to further describe his concerns and relocation request. Given that Sinn estimated it would take about two days for the letter to arrive and that Brush was expecting the letter, it is reasonable to infer that Brush received the letter with enough time before the second attack on April 30 to read and respond to it. As such, we may impute knowledge of the April 25 conversation and the details in Sinn's letter to Brush in analyzing the reasonableness of his response. By contrast, there is no evidence to support any knowledge on Brush's part of Sinn's April 28

grievance, and we do not address that grievance for purposes of this analysis.

According to Sinn, Brush already knew about the attack by the time the two spoke on the morning of April 25. Moreover, Sinn told Brush about his concern "[o]f getting beat up or having to get in an altercation." He informed Brush that he wanted to "be moved out of there" soon because he feared an attack "coming any second" and worried it was "just a matter of time before they feel like they're going to move in on [him] when they see the time is right." Sinn further emphasized that Brush "knew the system well enough to know what was messed up about it" and he knew "how much authority" gangs had at Putnamville. Indeed, at his deposition, Brush acknowledged that gangs, including the Vice Lords, were active in Putnamville.

Sinn's April 26 letter provides even more detail. Sinn notified Brush that the two other inmates attacked on April 24 were assaulted again after the IDOC relocated them and suggested that such attacks "show that the incident followed them to the new dorms." The swiftness of the second attack on the other two inmates makes Sinn's fear of another attack more credible. *See Gevas*, 798 F.3d at 481 (noting that the identification of "a specific, credible, and imminent risk of serious harm" helps "support an inference that the official to whom the complaint was communicated had actual knowledge of the risk"). Defendants contend that Sinn never referenced gang activity or gang violence in this letter. However, while the words "gang" and "Vice Lords" do not appear, Sinn does mention the "racial diferential [sic] of conflicts here at PCF" and indicates his status as a "white minority" who is "not af-

faliated [sic]" makes him vulnerable to attack. Sinn's reference to his unaffiliated status in particular shows his fear was more specific than a general complaint about racial tensions in prison.[5] In short, it is reasonable to infer, based on Brush's admitted understanding of gang violence at Putnamville, that Brush understood Sinn's letter as describing a fear of retaliation by the same gang that attacked him on April 24. In response, however, Brush did nothing.

Nevertheless, Brush insists he did not have the requisite knowledge to act with deliberate indifference because Sinn's complaints lacked sufficient specificity. Although "we have often found deliberate indifference where custodians know of threats to a *specific detainee* posed by a *specific source*," we are not "constrained by this fact pattern." *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005). Indeed, "[i]t is well settled" that plaintiffs can adequately establish deliberate indifference in circumstances where "the *specific* identity of the ultimate assailant is not known in advance of assault." *Id.* (emphasis added) (citing *Farmer*, 511 U.S. at 843; *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000); *Langston v. Peters*, 100 F.3d 1235, 1238–39 (7th Cir. 1996); *Swofford v. Mandrell*, 969 F.2d 547, 549–50 (7th Cir. 1992); *Walsh v. Mellas*, 837 F.2d 789, 796 (7th Cir. 1988)).

This is plain from *Farmer*'s foundational principles. *Farmer* states that an official cannot escape Eighth Amendment liability merely by showing he did not know the inmate "was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843. This is so

---

[5] As defendants' counsel conceded at oral argument, it is difficult to come up with a reason for Sinn to say "I'm not affaliated" [sic] in his letter if he was not alluding to a risk from a gang at Putnamville.

No. 18-1724                                                    15

because "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id*. Rather, what matters is the relevant defendant's subjective awareness, which includes the inmate's complaints along with any other information that defendant may have. *See id.* at 842 (a defendant's actual knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" (citations omitted)); *see also Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (jury could rely on both testimonial and documentary evidence in record that defendant-official had received report of a threat against plaintiff-inmate, yet had done nothing in response, to find deliberate indifference).

To support his argument, Brush relies on several cases in which we held that inmates' articulations of perceived threats were too vague or generalized to establish defendants' subjective knowledge. *See, e.g., Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (plaintiff's statements that other inmates were "'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play"); *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008) (inmate's statements to guards expressing fear for his life without identifying who was threatening him or what the threats were and requesting a relocation were insufficient to alert guards to specific threat); *Grieveson v. Anderson*, 538 F.3d 763, 776–77 (7th Cir. 2008) (deliberate indifference claim did not prevail on summary judgment despite inmate's four trips to emergency room for injuries consistent with assaults and

despite inmate's requests for relocation to a "safer" block because inmate never told prison officials about "a tangible threat to his safety or wellbeing"); *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (inmate did not show defendants had specific knowledge of threat where, after first attack and before second attack, he did not "specifically seek protection from the two inmates who assaulted him …, identify the twenty gang members who threatened him …, or inform authorities of the threats which were made against him"). However, our analysis in those cases about the specificity of the inmate's complaint was but one part of the greater analysis regarding the defendants' subjective knowledge.

Here, Sinn presented evidence that Brush was aware of the general patterns of gang violence at Putnamville and had independent knowledge of the April 24 gang-member attack on Sinn. The morning of April 25, Sinn and Brush discussed the attack and Sinn explained his desire to be moved for fear of another attack. And on April 26, Sinn sent Brush a letter explaining that the other two inmates attacked on April 24 were attacked again in their new dorms and reiterating his desire for an immediate transfer given his fear of attack based on his unaffiliated status. It is thus reasonable to infer that Brush knew about a specific risk Sinn faced of the Vice Lords attacking him again. This is so even though Brush may not have known who the individual attackers would be. Sinn has therefore raised a triable issue of fact as to whether Brush had subjective knowledge that Sinn faced a substantial risk of harm before the second attack on April 30, 2014.

### 2.  *Brush's Qualified Immunity*

Brush argues that he is still entitled to qualified immunity because "no reasonable official in [his] position would have

known that not immediately responding to Sinn's letter violated the Eighth Amendment." He contends Sinn's complaints were too generalized and "contained none of the hallmarks" of successful failure-to-protect claims.

This argument takes too narrow a view of failure-to-protect claims. The reason the specificity of an inmate's complaint matters is because that complaint is often the only information a prison official has of the treatment or conditions the inmate is experiencing. Failure-to-protect claims are predicated on a prison official's subjective knowledge, though, not just the ability of an inmate to write detailed complaints. *See Brown*, 398 F.3d at 915–16 (claims that custodial officers knew about inmate's violent propensities and history of attacking other inmates were sufficient to allege that they "were aware of an excessive risk" posed to the plaintiff who was ultimately attacked by that inmate). Framed this way, it is clearly established that a prison official's knowledge of prevalent gang violence, a prior attack on an inmate by gang members, and the victim's fear of a retaliatory attack by other gang members in a new dorm, supported by evidence that related victims from the first attack had already been attacked a second time after being relocated, necessitates that the prison official reasonably respond to abate that risk of harm to the victim. *See, e.g., Gevas*, 798 F.3d at 481–82 (plaintiff adduced sufficient evidence of prison official's actual knowledge by testifying he informed defendants of the identity of the person who threatened him, the nature of the threat, and enough context to render the threats plausible). Here, it is reasonable to infer that Brush had such knowledge but took *no* responsive action. It is well-settled, clearly established law that such a failure constitutes deliberate indifference. *See id.* at 484–85 (rejecting a qualified immunity defense). Thus, construing all facts in

Sinn's favor, Brush is not entitled to qualified immunity, and we reverse and remand the district court's grant of summary judgment on Sinn's deliberate indifference claim as to Brush.

### 3. *Knight's and Lemmon's Deliberate Indifference*

Sinn acknowledges that Stanley Knight and Bruce Lemmon—the former Putnamville Superintendent and former IDOC Commissioner—may not have known about his individual circumstances. Notwithstanding this fact, he argues they should be held liable as supervisors for deliberate indifference because they were aware of unsafe conditions at Putnamville and did nothing to remedy those issues or to ensure that prison officials followed policy. Putnamville had several systemic issues: overcrowding and understaffing, lack of surveillance monitoring, and rampant gang activity. Sinn argues that the combined effect of these issues made the prison a fertile ground for violence, and that the risk of harm to inmates in open dormitories was so obvious that Knight and Lemmon's failure to abate that risk with policy enforcement or development constituted deliberate indifference.

Individual defendants like Knight and Lemmon, who are responsible for setting prison policy, can be held liable for a constitutional violation if they are "aware of 'a systematic lapse in enforcement' of a policy critical to ensuring inmate safety" yet fail to enforce that policy. *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (quoting *Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988)). But an inmate cannot show a "widespread practice of an unconstitutional nature," such as a custom of ignoring prison policy, by pointing to "isolated incidents of inmate-on-inmate brutality." *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003); *see Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) ("A risk

of serious harm may be shown … by evidence of 'a series of bad acts' that 'the policymaking level of government was bound to have noticed,' like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault." (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)) (citing *Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir. 1984))).

We agree with defendants that Sinn did not present evidence of a history or pattern of violence at Putnamville such that a jury could infer a level of gang violence so pervasive that Knight and Lemmon actually knew of a substantial risk of harm to inmates. Sinn offers only limited evidence on this topic: (1) his own affidavit about observing regular violence in the absence of guards; (2) the affidavit of Mitchell Barnes, an inmate at Putnamville for some unknown time that included April 24–30, 2014, who similarly saw daily fights and a dearth of correctional officers; and (3) a report by Sinn's expert, who concluded that policy failures and bad practices caused Sinn's injuries.[6] Evidence of what Sinn observed and experienced over the course of his time at Putnamville, however, even when bolstered by Barnes's similar observations and an expert report that determined a causal link between the alleged failures and harm, is more akin to evidence of isolated incidents than it is proof of widespread unconstitutional practices. *See Smith*, 715 F.3d at 192; *Palmer*, 327 F.3d at 597.

---

[6] Sinn also included a declaration of Matthew Dunham, who worked at Putnamville from 2009 to 2012, and a declaration of Kandi Northcutt, who trained at Putnamville for one month in 2016; however, neither individual has knowledge of the relevant time period here.

Moreover, as defendants point out, even if Sinn could establish that Knight and Lemmon were aware that prison overcrowding, gang violence, and understaffing created unsafe prison conditions, there is evidence that reasonable steps were being taken to address these issues. Namely, the IDOC continues to recruit qualified personnel to fill its vacancies; the IDOC's zero-tolerance policy on gang activity requires staff to be trained on procedures to identify and monitor gang members so that housing assignments can be made accordingly; Putnamville has an STG (gang) coordinator; and the IDOC informs inmates how to report gang problems.

Therefore, no reasonable jury could infer that Knight and Lemmon were deliberately indifferent to a substantial risk of harm to inmates like Sinn. We affirm the district court's grant of summary judgment as to these defendants.

### III. Conclusion

For the foregoing reasons, we AFFIRM the grant of judgment on the pleadings as to Rodgers and Hoskins, AFFIRM the grant of summary judgment as to Knight and Lemmon, but REVERSE and REMAND the grant of summary judgment as to Brush.